DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By:     SAGAR K. RAVI
        Assistant United States Attorneys
        One Saint Andrew's Plaza
        New York, New York 10007
        Tel. (212) 637-2195

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :
                                            :
             -v.-                           :
                                            :     **VERIFIED COMPLAINT**
$424,753 IN UNITED STATES CURRENCY,         :     **FOR FORFEITURE**
                                            :
                       Defendant-*in-rem*.  :        23 Civ.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff United States of America, by its attorney Damian Williams, United States

Attorney for the Southern District of New York, for its verified complaint, alleges, upon

information and belief, as follows:

## I.   JURISDICTION AND VENUE

1.      This action is brought pursuant to Title 18, United States Code, Section 981 by the

United States of America seeking the forfeiture of $424,753 in United States currency (the

"Defendant Funds" or the "Defendant-*in-rem*").

2.      This Court has jurisdiction pursuant to Title 28, United States Code, Section 1355.

3.      Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because

certain actions and omissions giving rise to forfeiture took place in the Southern District of New

York, and pursuant to Title 28, United States Code, Section 1395, because the Defendant Funds

have been transferred to the Southern District of New York.

4.      The Defendant Funds constitute proceeds of wire fraud, in violation of Title 18,

United States Code, Sections 1343, property involved in money laundering, in violation of Title

18, United States Code, Section 1956, and property traceable to such property; and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A) and (C).

5.      Upon entry of a final order forfeiting the Defendant Funds to the United States, the Government intends to recommend that the Defendant Funds be distributed to victims of the payday lending scheme perpetrated by Scott Tucker ("Tucker"), consistent with the applicable Department of Justice regulations, through the ongoing remission process. *See* 18 U.S.C. § 981(e)(6) and 28 C.F.R. Part 9.

## II.      BACKGROUND

6.      On or about October 13, 2017, the Honorable P. Kevin Castel, United States District Judge, Southern District of New York, entered a judgment of conviction against Tucker and Timothy Muir, following a jury verdict finding Tucker and Muir guilty of, among other crimes, collection of unlawful debts, in violation of Title 18, United States Code, Section 1962; wire fraud, in violation of Title 18, United States Code, Section 1343; and money laundering, in violation of Title 18, United States Code, Section 1956; in connection with the unlawful activities of a group of payday lending businesses (the "Tucker Payday Lending Organization") that issued small, short-term, high-interest, unsecured loans, commonly referred to as "payday loans," to customers across the country.   A true and correct copy of the judgments of conviction of Tucker and Muir are attached to this complaint as Exhibits A and B.   The underlying Indictment containing the charges on which Tucker and Muir were convicted is attached to this complaint as Exhibit C.

7.      From approximately in or about 2003 until at least in or about 2013, Conly Schulte ("Schulte") was the lead partner with the law firm Fredericks Peebles & Morgan LLP ("Fredericks

Peebles") serving as counsel to The Miami Tribe of Oklahoma ("the Miami"), the Santee Sioux Tribe of Nebraska ("the Santee Sioux"), and the Modoc Tribe of Oklahoma ("the Modoc," and together with the Miami and the Santee Sioux, "the Tribes") in connection with business agreements concerning payday lending with Tucker and an entity controlled by Tucker (the "Tucker Payday Lending Business").  At the same time, from approximately in or about December 2003 until approximately in or about January 2008, Schulte also represented the same entity controlled by Tucker in connection with those same business agreements.  In or about January 2008, Schulte ceased formally representing the entity controlled by Tucker but continued to work with Tucker, and Tucker continued to pay Fredericks Peebles from bank accounts that were controlled by Tucker and held in the names of Tribal entities.

8.     The Tucker Payday Lending Business was part of the Tucker Payday Lending Organization, which was a criminal organization controlled by Tucker whose members and associates engaged in crimes including the collection of unlawful debts, wire fraud, and money laundering.  The Tucker Payday Lending Organization was based in Overland Park, Kansas and operated throughout the United States, including in the Southern District of New York.  The Tucker Payday Lending Organization constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise, in violation of the usury laws of numerous states, including New York.   As set forth further below and in the Indictment, the Tucker Payday Lending Organization's activities constituted a fraudulent scheme targeting millions of borrowers that involved the use of interstate wire communications, with hundreds of millions of dollars in proceeds of the scheme laundered through entities and bank accounts nominally held by the Tribes in order to conceal Tucker's ownership and control.

3

9.      Under the business agreements between the Tribes and the Tucker Payday Lending Organization, Tucker and the entity controlled by Tucker, and not the Tribes, provided the capital to make loans, and the Tribes and their entities were not responsible for any losses and received monthly payments of 1% of gross collected revenues from the Tucker Payday Lending Organization; none of the Tribes, nor any entity that they controlled, established or paid to acquire any part of the Tucker Payday Lending Organization.   Tucker and others based in Overland Park, Kansas, and not the Tribes, managed the loan operations and created the approval criteria.   All essential steps necessary for the approval of loans were performed in Overland Park, under the direction of Tucker and individuals ultimately reporting to Tucker.   Tucker, and others reporting to Tucker, controlled the collection of interest and principal on the loans and the profits earned from the lending activity.

10.      At all relevant times, Schulte was aware that the interest rates charged by Tucker on payday loans associated with the Tribes were illegal under the usury laws of several states in which payday loans were extended.

11.      In state court litigation concerning the Tucker Payday Lending Business, Schulte, and other attorneys at Fredericks Peebles acting under his direction, prepared and submitted multiple affidavits for representatives of each of the Tribes, who were also officers of Tribal entities that were involved in the Tucker Payday Lending Business.   These affidavits were submitted to make it appear that the Tribes managed and controlled portions of the Tucker Payday Lending Business, so that the Tribes could assert that their sovereign immunity applied to those portions of the Tucker Payday Lending Business and the business could evade state usury laws. Tribal representatives have admitted that these affidavits were false, in part, because they overstated the involvement of the representatives of the Tribes, the Tribes, and the entities

4

controlled by the Tribes in the operations of the Tucker Payday Lending Business; for example, several of the affidavits falsely stated, in substance and in part, that the Tribal representatives managed the day-to-day loan operations, that the loan transactions occurred on Tribal lands, and that 100% of the profits were used exclusively for the benefit of the Tribes.

### III.   THE DEFENDANT-IN-REM

12.     On or about June 19, 2019, Schulte entered into a Deferred Prosecution Agreement (the "DPA") with the United States related to his involvement in the payday lending business of Tucker and various companies and entities controlled by or associated with Tucker, from in or about 2003 to in or about 2013.   Under the DPA, Schulte agreed to forfeit $424,753 in United States currency to the Government and transferred the Defendant Funds to the United States in the Southern District of New York as a substitute *res* for net proceeds he personally obtained from Tucker in the conspiracy to collect unlawful debts described above.   Pursuant to the DPA, Schulte agreed that the Defendant Funds are subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C).

13.     The DPA and the accompanying Statement of Facts are attached hereto as Exhibit D.

### IV.   **CLAIM FOR FORFEITURE**

14.     Incorporated herein are the allegations contained in paragraphs one through 12 of this Verified Complaint.

15.     Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

16.     "Specified unlawful activity" is defined in Title 18, United States Code, Section 1956(c)(7), and the term includes, among other things, any offense listed under Title 18, United States Code, Section 1961(1).   Section 1961(1) lists, among other things, wire fraud (Section 1343).

17.     Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

18.     By reason of the foregoing, the Defendant Funds are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A) and (a)(1)(C), because the Defendant Funds constitute proceeds of wire fraud, in violation of Title 18, United States Code, Sections 1343, property involved in money laundering, in violation of Title 18, United States Code, Section 1956, and property traceable to such property.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant-*in-rem* and that all persons having an interest in the Defendant-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-*in-rem* to the United States of America for disposition according

to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper,

together with the costs and disbursements of this action.

Dated: New York, New York
      April 14, 2023

                          DAMIAN WILLIAMS
                          United States Attorney for the
                          Southern District of New York
                          Attorney for the Plaintiff
                          United States of America

By:        _____
                          SAGAR K. RAVI
                          Assistant United States Attorney
                          One St. Andrew's Plaza
                          New York, New York 10007
                          Telephone: (212) 637-2195

## **VERIFICATION**

STATE OF NEW YORK                              )
COUNTY OF NEW YORK                        :
SOUTHERN DISTRICT OF NEW YORK   )

      JERRY D. WHITTEN, being duly sworn, deposes and says that he is a Special Agent with the Internal Revenue Service – Criminal Investigations ("IRS-CI"), and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief.

      The sources of deponent's information on the ground of his belief are official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials, during an investigation of alleged violations of Titles 18, United States Code.


JERRY D. WHITTEN
Special Agent
Internal Revenue Service --
Criminal Investigations

# EXHIBIT A

AO 245B (Rev. 09/17)  Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| SCOTT TUCKER | Case Number: 1: 1: S1 16 CR 00091-001 (PKC) |
| | USM Number: 06133-045 |
| | Lee Alan Ginsberg, Esq. (Niketh Velamoor, AUSA) |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1962(d) | Conspiracy to Collect Unlawful Debts: Tucker Payday Lending Organization | 8/31/2013 | 1 |
| 18 USC 1962(c), | Collection of Unlawful Debts - Ameriloan, United Case | 8/31/2013 | 2 |

   The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-5-18

1/5/2018
Date of Imposition of Judgment

_____
Signature of Judge

P. Kevin Castel, U.S.D.J.
Name and Title of Judge

1-5-18
Date

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
                        Sheet 1A

|  |  |  | Judgment—Page | 2 | of | 8 |
| --- | --- | --- | --- | --- | --- | --- |

DEFENDANT: SCOTT TUCKER
CASE NUMBER:  1: 1: S1 16 CR 00091-001 (PKC)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
| --- | --- | --- | --- |
| 18 USC 1962(c) | Loans, and US FastCash | | |
| 18 USC 1962(c) | Collection of Unlawful Debts - 500 FastCash | 8/31/2013 | 3 |
| 18 USC 1962(c) | Collection of Unlawful Debts - One Click Cash | 8/31/2013 | 4 |
| 18 USC 1349 | Conspiracy to Commit Wire Fraud | 8/31/2013 | 5 |
| 18 USC 1343 | Wire Fraud | 8/31/2013 | 6 |
| 18 USC 1956(b) | Conspiracy to Commit Money Laundering | 8/31/2013 | 7 |
| 18 USC 1956(a)(1)(A)(i) | Promotion of Money Laundering | 8/31/2013 | 8 |
| 18 USC 1956(a)(1)(B)(i) | Concealment of Money Laundering | 8/31/2013 | 9 |
| 15 USC 1611 | Filing False TILA Disclosures - Ameriloan | 12/31/2012 | 10 |
| 15 USC 1611 | Filing False TILA Disclosures - United Cash Loans | 12/31/2012 | 11 |
| 15 USC 1611 | Filing False TILA Disclosures - US FastCash | 12/31/2012 | 12 |
| 15 USC 1611 | Filing False TILA Disclosures - 500 FashCash | 12/31/2012 | 13 |
| 15 USC 1611 | Filing False TILA Disclosures | 12/31/2012 | 14 |

AO 245B (Rev. 09/17)  Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    3    of    8

DEFENDANT:  SCOTT TUCKER
CASE NUMBER:  1:  1: S1 16 CR 00091-001 (PKC)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

200 months on Counts 1-9 and 12 months on Counts 10-14, to run concurrently.

☐  The court makes the following recommendations to the Bureau of Prisons:

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

☐  at _____  ☐ a.m.  ☐ p.m.  on _____ .

☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐  before 2 p.m. on _____ .

☐  as notified by the United States Marshal.

☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____  to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/17)  Judgment in a Criminal Case
            Sheet 3 — Supervised Release

| | | Judgment—Page | 4 | of | 8 |

DEFENDANT: SCOTT TUCKER
CASE NUMBER: 1: 1: S1 16 CR 00091-001 (PKC)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

3 years.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/17)  Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page **5** of **8**

DEFENDANT: SCOTT TUCKER
CASE NUMBER: 1: 1: S1 16 CR 00091-001 (PKC)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

AO 245B (Rev. 09/17)  Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | Judgment—Page | 6 | of | 8 |
| --- | --- | --- | --- | --- |

DEFENDANT:  SCOTT TUCKER
CASE NUMBER:  1:  1: S1 16 CR 00091-001 (PKC)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant will provide the probation officer with access to any requested financial information

The defendant will not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

The defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of release may be found. The search must be conducted at a reasonable time and in reasonable manner. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

AO 245B (Rev. 09/17)  Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

|  | Judgment — Page | 7 | of | 8 |

DEFENDANT: SCOTT TUCKER
CASE NUMBER: 1: 1: S1 16 CR 00091-001 (PKC)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 1,025.00 | $ | $ 25,000.00 | $ |

☑ The determination of restitution is deferred until  4/5/2018 . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the  ☐ fine   ☐ restitution.

☐ the interest requirement for the  ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B  (Rev. 09/17) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page   8   of   8

DEFENDANT:  SCOTT TUCKER
CASE NUMBER:  1: 1: S1 16 CR 00091-001 (PKC)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ ___1,025.00___  due immediately, balance due

  ☐  not later than _____ , or
  ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
    _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
    term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

  Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
  Ordered.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

# EXHIBIT B

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| TIMOTHY MUIR | ) Case Number:  1:  S1 16 CR 00091-002 (PKC) |
| | ) USM Number:  27904-031 |
| | ) Thomas J. Bath, Esq. (Niketh Velamoor, AUSA) |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14.
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1962(d) | Conspiracy to Commit Racketeering through the Collection of Unlawful Debts | 8/31/2013 | 1 |
| 18 USC 1962(c) | Racketeering through the Collection of Unlawful Debts | 8/31/2013 | 2 |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is  ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

> **USDC SDNY**
> **DOCUMENT**
> **ELECTRONICALLY FILED**
> **DOC #:** _____
> **DATE FILED:** _1-5-18_

1/5/2018
Date of Imposition of Judgment

Signature of Judge

P. Kevin Castel, U.S.D.J.
Name and Title of Judge

1-5-18
Date

AO 245B (Rev. 09/17)  Judgment in a Criminal Case
Sheet 1A

Judgment—Page __2__ of __8__

DEFENDANT:  TIMOTHY MUIR
CASE NUMBER:  1: S1 16 CR 00091-002 (PKC)

# ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1962(c) | Racketeering through the Collection of Unlawful Debts | 8/31/2013 | 3 |
| 18 USC 1962(c) | Racketeering through the Collection of Unlawful Debts | 8/31/2013 | 4 |
| 18 USC 1349 | Conspiracy to Commit Wire Fraud | 8/31/2013 | 5 |
| 18 USC 1343 | Wire Fraud | 8/31/2013 | 6 |
| 18 USC 1956(b) | Conspiracy to Commit Money Laundering | 8/31/2013 | 7 |
| 18 USC 1956(a)(1)(A)(i) | Promotion of Money Laundering | 8/31/2013 | 8 |
| 18 USC 1956(a)(1)(B)(i) | Concealment of Money Laundering | 8/31/2013 | 9 |
| 15USC1611 & 18 USC 2 | Filing False TILA Disclosures | 12/31/2012 | 10 |
| 15USC1611 & 18 USC 2 | Filing False TILA Disclosures | 12/31/2012 | 11 |
| 15USC1611 & 18 USC 2 | Filing False TILA Disclosures | 12/31/2012 | 12 |
| 15USC1611 & 18 USC 2 | Filing False TILA Disclosures | 12/31/2012 | 13 |
| 15USC1611 & 18 USC 2 | Filing False TILA Disclosures | 12/31/2012 | 14 |

AO 245B (Rev. 09/17) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __3__ of __8__

DEFENDANT: TIMOTHY MUIR
CASE NUMBER: 1: S1 16 CR 00091-002 (PKC)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

84 months on Counts 1-9 and 12 months on Counts 10-14, to run concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

the defendant serve in sentence at Leavenworth Camp in Leavenworth, Kansas.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____.

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑ before 2 p.m. on _____2/27/2018_____. or if none designated to the District of Kansas.

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/17)  Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page __4__ of __8__

DEFENDANT: TIMOTHY MUIR
CASE NUMBER: 1: S1 16 CR 00091-002 (PKC)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

3 years.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
                       Sheet 3A — Supervised Release

Judgment—Page ___5___ of ___8___

DEFENDANT: TIMOTHY MUIR
CASE NUMBER: 1: S1 16 CR 00091-002 (PKC)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____          Date _____

AO 245B (Rev. 09/17)  Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | Judgment—Page | 6 | of | 8 |

DEFENDANT: TIMOTHY MUIR
CASE NUMBER: 1: S1 16 CR 00091-002 (PKC)

## SPECIAL CONDITIONS OF SUPERVISION

You must follow the instructions of the probation officer related to the conditions of supervision.

The defendant will provide the probation officer with access to any requested financial information

The defendant will not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

The defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of release may be found. The search must be conducted at a reasonable time and in reasonable manner. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

AO 245B (Rev. 09/17) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page __7__ of __8__

DEFENDANT: TIMOTHY MUIR
CASE NUMBER: 1: S1 16 CR 00091-002 (PKC)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 1,025.00 | $ | $ | $ |

☑ The determination of restitution is deferred until __4/5/2018__ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B  (Rev. 09/17)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page  __8__  of  __8__

DEFENDANT:  TIMOTHY MUIR
CASE NUMBER:  1:  S1 16 CR 00091-002 (PKC)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☑  Lump sum payment of $  __1,025.00__  due immediately, balance due

       ☐  not later than  _____ , or
       ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B   ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C   ☐  Payment in equal  _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
       _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D   ☐  Payment in equal  _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
       _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
       term of supervision; or

E   ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
       imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate
Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
    and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
    Ordered.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine
interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

# EXHIBIT C

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA
                                    :
     -v-
                                    :
SCOTT TUCKER and
TIMOTHY MUIR,                       :

           Defendants.              :

- - - - - - - - - - - - - - - - - - x
```

**ORIGINAL**

**SUPERSEDING**
**INDICTMENT**

S1 16 Cr. 091 (PKC)

## COUNT ONE
**(Conspiracy To Collect Unlawful Debts:**
**Tucker Payday Lending Organization)**

The Grand Jury charges:

### BACKGROUND

1.    At all times relevant to this Indictment, SCOTT
TUCKER, the defendant, owned and operated a group of payday
lending businesses (the "Tucker Payday Lenders") that issued
small, short-term, high-interest, unsecured loans, commonly
referred to as "payday loans," to customers across the country.
Although other people and entities were listed as the Tucker
Payday Lenders' owners on certain documents, in truth and in
fact, at all relevant times, TUCKER was the source of the funds
lent to customers by the Tucker Payday Lenders, and TUCKER bore
the risk of non-repayment of the loans.  In addition, TUCKER
controlled the Tucker Payday Lenders' day-to-day operations,
finances, lending decisions, distribution of profits, hiring and

termination of employees, advertising and solicitation of customers, and banking and other third-party relationships.

2.     At all times relevant to this Indictment, the Tucker Payday Lenders held themselves out as separate businesses known as Ameriloan, f/k/a Cash Advance ("Ameriloan"), One Click Cash, f/k/a Preferred Cash Loans ("OCC"), United Cash Loans, US FastCash, 500 FastCash, Advantage Cash Services and Star Cash Processing.  However, while each of the Tucker Payday Lenders issued a distinct portfolio of loans, the Tucker Payday Lenders shared the employees, computer systems and other operating costs and infrastructure of a single lending business located in Overland Park, Kansas.  That business, known as AMG Services, Inc., f/k/a CLK Management, f/k/a National Money Service, Inc. ("AMG"), was at all relevant times directly or beneficially owned and operated by SCOTT TUCKER, the defendant.  At times, under TUCKER's direction and control, AMG employed over 600 individuals to operate the Tucker Payday Lenders.

3.     At times relevant to this Indictment, TIMOTHY MUIR, the defendant, was an attorney admitted to practice in the State of Kansas.  Beginning in or about 2006, MUIR acted as the general counsel for AMG.

**OVERVIEW OF THE UNLAWFUL SCHEME**

4.     From at least in or about 1997 up to and including in

2

or about August 2013, through the Tucker Payday Lenders, SCOTT
TUCKER and TIMOTHY MUIR, the defendants, systematically
exploited over four and a half million working people throughout
the United States who were struggling to pay basic living
expenses, including for food and housing.   TUCKER and MUIR,
through the Tucker Payday Lenders, extended loans to these
individuals at usurious interest rates as high as 700% or more
using deceptive and misleading communications and contracts, and
in violation of the usury laws of numerous states, including New
York State, that were designed to protect residents from such
loan sharking and abusive conduct.   In doing so, TUCKER and MUIR
forced many of these individuals into cycles of debt in which
they incurred new usurious payday loans – including from the
Tucker Payday Lenders – in order to pay off their existing debt.

     5.    Throughout their existence, as SCOTT TUCKER and
TIMOTHY MUIR, the defendants, well knew, the Tucker Payday
Lenders received complaints from thousands of customers across
the country, and numerous state regulators and consumer
protection groups, about the lenders' deceptive, misleading, and
usurious practices.   Beginning in 2003, several states filed
lawsuits to stop TUCKER and the Tucker Payday Lenders from
extending usurious and abusive loans to their citizens in
violation of their respective laws.

6.    Also beginning in approximately 2003, to defeat the state lawsuits, to attempt to avoid future civil and criminal liability for his conduct, and to enable the Tucker Payday Lenders to persist in extending usurious loans contrary to state laws, SCOTT TUCKER, the defendant, entered into sham business relationships with certain Native American tribes (collectively, "Tribes 1-3") and thereafter claimed that the Tucker Payday Lenders could not be sued because they were entitled to the protection of "tribal sovereign immunity," a legal doctrine that generally prevents states from enforcing their laws against Native American tribes.    In particular, to defeat the state lawsuits, attorneys for TUCKER, including TIMOTHY MUIR, the defendant, prepared and submitted to courts materially false and misleading affidavits about the relationship between Tribes 1-3 and the Tucker Payday Lenders to create the false impression that Tribes 1-3 played a substantive role in the ownership and operation of the Tucker Payday Lenders.    In truth and in fact, as TUCKER and MUIR well knew and privately admitted, Tribes 1-3 played no such role, and were instead deliberately used by TUCKER and MUIR as mere conduits for TUCKER's unlawful business. In reliance on these materially false and misleading affidavits, state courts dismissed certain state lawsuits on "tribal sovereign immunity" grounds.

4

7.    The Tucker Payday Lenders generated enormous revenues
and profits.  In particular, from approximately 2003 to 2012,
the Tucker Payday Lenders generated over $2 billion in revenues,
from which SCOTT TUCKER, the defendant, received hundreds of
millions of dollars in profits.  Of those unlawful proceeds,
TUCKER spent over $100 million on personal expenses such as
luxury homes and automobiles, jewelry, a private airplane, and
the expenses of a professional auto racing team which, according
to its web site, races Ferraris in "marquee" events throughout
the world including in France, Monaco, and Abu Dhabi.  In many
cases, TUCKER paid for these personal expenses with funds taken
directly from bank accounts nominally in the names of Tribes 1-3
but in fact controlled entirely by TUCKER.

### Applicable State Usury Laws, and States in Which the Tucker Payday Lenders Operated

8.    Fourteen states, including New York State, and the
District of Columbia prohibit payday loans or have usury limits
that effectively prohibit payday loans within their
jurisdictions (collectively, the "Prohibited Payday Loan
States").  For example, in relevant part, New York's civil usury
law prohibits charging more than 16% interest on a loan
annually, and New York's criminal usury law makes it a crime to
knowingly charge more than 25% interest on a loan annually.

5

Arizona, Arkansas, Connecticut, the District of Columbia, Georgia, Maryland, Massachusetts, Montana, New Hampshire, New Jersey, North Carolina, Ohio, Pennsylvania, Vermont, and West Virginia similarly have laws which set interest limits that effectively prohibit payday lending. While the lawful maximum interest rate varies in the Prohibited Payday Loan States, the highest permissible annual interest rate in any of these states is 36%. With the exception of Georgia, West Virginia and (after July 1, 2010) Arizona, the Tucker Payday Lenders did business in all of the Prohibited Payday Loan States, while charging annual interest rates many times higher than the rates allowed in these states.

9.   The Tucker Payday Lenders also violated the usury laws of many other states, which permit payday lenders, typically if licensed in the state, to extend high-interest payday loans (collectively, the "Regulated Payday Loan States"). Regulated Payday Loan States include, among others, California, Florida, Indiana, Iowa, Kentucky, Maine, Michigan, Minnesota, Nebraska, Oklahoma, Oregon, South Carolina, Tennessee and Washington. The highest lawful interest that may be charged under these states' laws varies by state. The Tucker Payday Lenders violated the usury laws of the Regulated Payday Loan States variously by failing to obtain a license to operate within any of the states

6

in which licenses were required, and by extending loans at
interest well in excess of what is allowed under the laws of
these states.

10. The Tucker Payday Lenders extended loans to millions
of consumers across the country in violation of the laws of the
Prohibited Payday Loan States and the Regulated Payday Loan
States. In New York, for example, between approximately 2008
and 2012, the Tucker Payday Lenders extended loans to hundreds
of thousands of individuals including, as to each Tucker Payday
Lender, individuals in the Southern District of New York.

### The Truth in Lending Act ("TILA")

11. TILA is a federal statute intended to ensure that
credit terms are disclosed to consumers in a clear and
meaningful way, both to protect customers against inaccurate and
unfair credit practices, and to enable them to compare credit
terms readily and knowledgeably. Among other things, TILA and
its implementing regulations require lenders, including payday
lenders like the Tucker Payday Lenders, to accurately, clearly
and conspicuously disclose, before any credit is extended, the
finance charge, the annual percentage rate, and the total of
payments that reflect the legal obligation between the parties
to the loan.

7

## **MEANS AND METHODS OF THE CONSPIRACY**

12. At all times relevant to this Indictment, to procure customers, the Tucker Payday Lenders relied primarily on the services of a Nevada-based "lead generator" (the "Lead Generator"). The Lead Generator, which was owned by SCOTT TUCKER, the defendant, until in or about 2007, relied at all relevant times on the Tucker Payday Lenders for at least half of its revenues. To procure customers, the Lead Generator ran nationwide television advertisements featuring a celebrity spokesperson who encouraged people to visit the Lead Generator's website to obtain a short-term lending tool "that will help fix your financial problems." Once visitors to the Lead Generator's website provided, through the website, their employer, income, and bank account information, the Lead Generator connected them immediately with the website of a payday lender, typically one of the Tucker Payday Lenders, which operated through websites including ameriloan.com, 500fastcash.com, oneclickcash.com, unitedcashloans.com and usfastcash.com.

### The Deceptive and Misleading Loan Term Disclosures

13. The websites of the Tucker Payday Lenders informed the potential customers of the loan amount they could receive, which was based in part on the potential customers' claimed income and employment. The websites then required the potential customers

8

electronically to indicate that they had read certain documents on the website, including a "Loan Note and Disclosure," and that they preauthorized electronic funds withdrawals from their accounts by the Tucker Payday Lenders to repay the loan. Thereafter, the Tucker Payday Lenders made the loan amounts available by electronic deposit as soon as the next day.

14.   The Tucker Payday Lenders' Loan Note and Disclosure prominently featured, in a large, bold box, a "Disclosure of Credit Terms" (the "TILA Box") that purported to state in clear and simple terms, as required by TILA, the cost of the loan to the borrower.  For example, for a loan of $500, the TILA Box provided that the "FINANCE CHARGE" – meaning the "dollar amount the credit will cost you" – would be $150, and that the "Total of Payments" – meaning the "amount you will have paid after you have made the scheduled payment" – would be $650.  Thus, in substance, the TILA Box stated that a $500 loan to the customer would cost $650 to repay.  In addition, the TILA Box also set forth the annualized interest rate of such a loan namely, 782.14%.  While the amounts set forth in the Tucker Payday Lenders' TILA Box varied according to the terms of particular customers' loans, they reflected, in substance, that the borrower would pay $30 in interest for every $100 borrowed.

15.   In truth and in fact, and as SCOTT TUCKER and TIMOTHY

9

MUIR, the defendants, well knew, the Tucker Payday Lenders' TILA
boxes were materially deceptive and misleading. While the TILA
Box suggested the borrower would pay $30 in interest for every
$100 borrowed, in truth and in fact, through at least 2012,
TUCKER and his co-conspirators structured the repayment schedule
of the loans such that, on the borrower's payday, the Tucker
Payday Lenders automatically withdrew the entire interest
payment due on the loan but left the principal balance untouched
so that, on the borrower's next payday, they could again
automatically withdraw an amount equaling the entire interest
payment due (and already paid) on the loan. With TUCKER's
approval, the Tucker Payday Lenders proceeded automatically to
withdraw such "finance charges" payday after payday (typically
every two weeks), applying none of the money toward repayment of
principal, until at least the fifth payday, when they began to
withdraw an additional $50 per payday to apply to the principal
balance of the loan. Even then, the Tucker Payday Lenders
continued to assess and automatically withdraw the entire
interest payment calculated on the remaining principal balance
until the entire principal amount was repaid. Accordingly, as
TUCKER and MUIR well knew, the Tucker Payday Lenders' TILA box
materially understated the amount the loan would cost, including
the total of payments that would be taken from the borrower's

10

bank account.

16.   Specifically, for a customer who borrowed $500, contrary to the TILA Box disclosure stating that the finance charge would be $150, amounting to $650 in total payments by the borrower, in truth and in fact, and as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, the finance charge was $1425, amounting to $1925 in total payments by the borrower.   The Tucker Payday Lenders' actual, automatic repayment schedule for such a loan was as follows:

| Payday | Funds Taken from Customer by Tucker Payday Lenders | Amount Applied to "Finance Charge" | Amount Applied to Pay Down Principal | Principal Balance Remaining |
|--------|--------|--------|--------|--------|
| 1 | $150 | $150 | $0 | $500 |
| 2 | $150 | $150 | $0 | $500 |
| 3 | $150 | $150 | $0 | $500 |
| 4 | $150 | $150 | $0 | $500 |
| 5 | $200 | $150 | $50 | $450 |
| 6 | $185 | $135 | $50 | $400 |
| 7 | $170 | $120 | $50 | $350 |
| 8 | $155 | $105 | $50 | $300 |
| 9 | $140 | $90 | $50 | $250 |
| 10 | $125 | $75 | $50 | $200 |
| 11 | $110 | $60 | $50 | $150 |

11

| 12    | $95    | $45    | $50   | $100 |
|-------|--------|--------|-------|------|
| 13    | $80    | $30    | $50   | $50  |
| 14    | $65    | $15    | $50   | $0   |
| **TOTAL** | **$1925** | **$1425** | **$500** |      |

Nowhere did the Loan Note and Disclosure provide these accurate figures to borrowers.

17. As SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, from the inception of TUCKER's operation of the Tucker Payday Lenders, many customers who had repaid the loan amounts set forth in the Tucker Payday Lenders' TILA Box expressed surprise and confusion at the amounts the Tucker Payday Lenders were continuing to withdraw from their bank accounts, and complained that they had been misled as to the cost of the loans. Thousands of customers complained directly to the Tucker Payday Lenders, to their banks, to consumer protection groups, and to regulators across the country that the Tucker Payday Lenders' loans were materially deceptive, misleading and usurious. When customers complained to state regulators, or threatened to sue, the Tucker Payday Lenders, at TUCKER's and MUIR's direction, often simply stopped withdrawing additional money from the customers' bank accounts and cancelled the customers' so-called remaining principal balances. At no

12

relevant time did TUCKER or MUIR correct the Tucker Payday Lenders' TILA Box disclosures to accurately set forth the cost of the loans.

18. Imposing finance charges far in excess of the finance charges disclosed by the TILA Box was instrumental to the profits the Tucker Payday Lenders reaped for SCOTT TUCKER and TIMOTHY MUIR, the defendants. For that reason, TUCKER and MUIR, through their employees and associates, sought to prevent their customers from understanding the true finance charges that they would incur under the actual terms of their loans. That is, customers were led to believe that they were repaying their loans on the schedule disclosed by the TILA Box rather than the Tucker Payday Lenders' actual, automatic repayment schedule that resulted in far greater finance charges.

19. Also as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, low-income customers who had taken out the loans to pay the expenses of daily living told the Tucker Payday Lenders that the amounts being automatically withdrawn from their accounts, which were far in excess of the amounts set forth in the TILA Box, were making it impossible for them to pay their bills. Further, as many explained, the Tucker Payday Lenders' automatic withdrawals from their accounts caused those accounts to incur negative balances, forcing the customers to

13

reimburse their banks and incur additional bank fees and expenses or, for those who could not afford such payments, rendering their accounts inoperable. As a result, many of these customers were forced to take out new usurious loans – including from the Tucker Payday Lenders – to pay their bills, to cover the unexpected additional "finance charges" on the Tucker Payday Lenders' loans, and to pay additional costs that arose from those loans.

### The Sham Relationship with Tribes 1-3

20. In addition to receiving complaints from customers, the Tucker Payday Lenders received voluminous complaints from third parties, including numerous state regulators, for, among other things, deceiving customers and violating state usury caps and other consumer protection laws. Rather than take steps to comply with state laws or otherwise address the Tucker Payday Lenders' alleged abuse of their customers, SCOTT TUCKER, the defendant, entered into a series of sham business relationships to conceal his ownership and control of the Tucker Payday Lenders and to evade applicable state laws.

21. Beginning in or about 1997, SCOTT TUCKER, the defendant, in partnership with a co-conspirator not named herein ("CC-1"), offered his payday loans through a Delaware-chartered bank (the "Delaware Bank"), falsely representing in loan

14

documents that the Delaware Bank was the lender when, in truth and in fact, as TUCKER and CC-1 well knew, it was TUCKER and CC-1 who provided the funds for the loans and controlled the loan approval process. TUCKER and CC-1 engaged in this deceit in order to improperly avail themselves of laws which entitle banks to "export" the interest rate of their home state, and thereby to avoid usury laws that are more restrictive than those of their home state. Eventually, after the Delaware Bank sought to impose certain restrictions on TUCKER's payday lending activities, TUCKER ended his relationship with the Delaware Bank.

22. In 2003, the State of Kansas accused SCOTT TUCKER, the defendant, and certain of the Tucker Payday Lenders of operating unlicensed payday loan businesses in Kansas and of issuing usurious loans to Kansas customers in violation of the state's usury laws. Subsequently, authorities in other states, including Colorado and California, filed lawsuits against the Tucker Payday Lenders that made similar allegations, and that sought to enjoin the Tucker Payday Lenders from making such usurious loans to their residents.

23. In order to thwart state authorities' enforcement efforts, beginning in 2003, SCOTT TUCKER, the defendant, entered into additional sham business relationships, this time with

15

Tribes 1-3, and then claimed that "tribal sovereign immunity" prevented states and private citizens from taking any action against the Tucker Payday Lenders or him.  Thereafter, in the lawsuits, TUCKER's lawyers, including TIMOTHY MUIR, the defendant, prepared and submitted materially false and misleading affidavits about the tribes' supposed substantive ownership and control of the Tucker Payday Lenders, whereupon courts eventually dismissed each state's lawsuit on "tribal sovereign immunity" grounds.

24.  In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1-3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time.  To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents.  However, in truth and in fact, at all relevant times, and as TUCKER and

16

MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

25.  Similarly, to create the sham appearance that Tribes 1-3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers.  TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

26.  To further create the false appearance of tribal ownership and operation of the Tucker Payday Lenders, and as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, AMG employees falsely claimed to customers and others on the telephone that they were located in Oklahoma or Nebraska, where Tribes 1-3 were located.  In addition, employees were provided with daily weather reports for these locations so that they

17

could more effectively dupe customers and others into believing they were located there, when in truth and in fact, and as TUCKER and MUIR well knew, they were located at all times at AMG's offices in Kansas.

27.    The sham relationships with Tribes 1-3 served not only to deceive state authorities, but, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, to deceive the Tucker Payday Lenders' customers into paying more money to the Tucker Payday Lenders than was legally owed.  The Tucker Payday Lenders accomplished this goal, in part, by claiming that their illegal interest rates were legally enforceable because the lenders were owned by Tribes 1-3 and operated from the reservations of Tribes 1-3, even though, as TUCKER and MUIR well knew, the Tucker Payday Lenders were in fact owned by TUCKER and operated from Overland Park, Kansas.  Based on these and other misrepresentations about the sham relationships with Tribes 1-3, the Tucker Payday Lenders induced customers to pay additional money to the Tucker Payday Lenders in the form of interest that was in fact unlawful to charge and unenforceable in the customers' states.

28.    TIMOTHY MUIR, the defendant, served as an architect of the structure designed to mislead state authorities as to the true ownership and control of the Tucker Payday Lenders.  In

18

addition, to bolster the false appearance of tribal ownership
and control of the Tucker Payday Lenders, and to obstruct state
regulatory efforts, MUIR caused a sham lawsuit to be filed by
SCOTT TUCKER, the defendant, against AMG, despite the fact that
AMG was MUIR's client.  MUIR further assisted in the execution
of sham transactions which enabled TUCKER to funnel tens of
millions of dollars from the Tucker Payday Lenders to TUCKER in
a manner that concealed TUCKER's ownership and control of the
Tucker Payday Lenders.  MUIR undertook each of these actions
with the encouragement and authorization of TUCKER.

　　　　29.　　Contrary to the sham appearance that the defendants
created of tribal ownership and control of the Tucker Payday
Lenders, at all times, as SCOTT TUCKER and TIMOTHY MUIR, the
defendants, well knew, TUCKER remained the source of capital for
the Tucker Payday Lenders, TUCKER bore the financial risk
associated with the operation of the businesses, and TUCKER
owned and controlled the Tucker Payday Lenders' profits.
Further, TUCKER and/or other AMG employees at his direction,
including at times MUIR, made the credit, strategic, and other
material decisions, directed and carried out the servicing and
collection of loan obligations, managed relationships with third
parties (including banks and payment processors, among others),
and performed the other substantive financial and operational

19

functions for the Tucker Payday Lenders.

## Statutory Allegations

### The Enterprise

30. At all times relevant to this Indictment, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and other individuals and corporations known and unknown, were members and associates of an internet payday lending enterprise (the "Tucker Payday Lending Organization"), a criminal organization whose members and associates engaged in crimes including the collection of unlawful debts.

31. The Tucker Payday Lending Organization, including its leadership, membership, and associates, constituted an "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4) -- that is, a group of individuals and corporations associated in fact. This enterprise was engaged in, and its activities affected, interstate and foreign commerce. The Tucker Payday Lending Organization was an organized criminal group with leadership based in Overland Park, Kansas, and that operated throughout the United States, including in the Southern District of New York. The Tucker Payday Lending Organization constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

20

32. The Tucker Payday Lending Organization was owned, led and controlled by SCOTT TUCKER, the defendant. TIMOTHY MUIR, the defendant, was also a leader of the Tucker Payday Lending Organization.

33. The purpose of the enterprise was to enrich the leader, members and associates of the enterprise through the collection of unlawful debts.

34. The means and methods by which SCOTT TUCKER and TIMOTHY MUIR, the defendants, and their co-conspirators, and other members and associates, conducted and participated in the conduct of the affairs of the Tucker Payday Lending Organization were the operation of payday loan companies in the business of lending money at rates usurious under State law, where the usurious rates were at least twice the enforceable rate.

## The Unlawful Debt Conspiracy

35. From at least in or about 1997 through in or about August 2013, in the Southern District of New York and elsewhere, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, being persons employed by and associated with the enterprise described in paragraphs 1 through 34 above, namely, the Tucker Payday Lending Organization, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, willfully and knowingly combined, conspired,

21

confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through the collection of unlawful debt, as set forth below.

36. The collection of unlawful debt, as that term is defined in Title 18, United States Code, Section 1961(6), through which the defendants and their co-conspirators agreed to conduct and participate directly and indirectly in the conduct of the affairs of the enterprise, consisted of the collection of unlawful usurious debts, that is, debts which are unenforceable under the laws of the State of New York and other States in whole and in part as to principal and interest and which were incurred in connection with the business of lending money and a thing of value at rates usurious under the laws of the State of New York and other states, where the usurious rates were at least twice the enforceable rates. It was a part of the conspiracy that SCOTT TUCKER AND TIMOTHY MUIR, the defendants, and others known and unknown, agreed that a conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of the enterprise.

(Title 18, United States Code, Section 1962(d).)

22

## COUNT TWO
### (Collection of Unlawful Debts –
Ameriloan, United Cash Loans and US FastCash)

The Grand Jury further charges:

37.    The allegations contained in paragraphs 1 through 34 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

38.    From at least in or about 2003, up to and including in or about August 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, in the Southern District of New York and elsewhere, being persons employed by and associated with the enterprise described in paragraphs 1 through 34 above, namely, the Tucker Payday Lending Organization, which enterprise was engaged in, and the activities of which affected interstate and foreign commerce, willfully and knowingly did conduct and participate, directly and indirectly, in the conduct of such enterprise's affairs through the collection of unlawful debt, as described in paragraph 36.

39.    The collection of unlawful debt, as that term is defined in Title 18, United States Code, Section 1961(6), that is, a debt (A) which is unenforceable under the laws of the State of New York and other States in whole and in part as to principal and interest because of the laws relating to usury,

23

and (B) which was incurred in connection with the business of
lending money and a thing of value at rates usurious under the
laws of the State of New York and other States, where the
usurious rates were at least twice the enforceable rates,
through which SCOTT TUCKER and TIMOTHY MUIR, the defendants, did
conduct and participate in the affairs of the enterprise, which
was engaged in and the activities of which affected interstate
commerce, consisted of collecting and attempting to collect an
unlawful debt as follows:

a.     From at least in or about 2012, up to and
including in or about 2013, SCOTT TUCKER and TIMOTHY MUIR, the
defendants, and others known and unknown, participated in the
collection and attempted collection of unlawful usurious loans
from a customer in the Bronx, New York ("Customer-1").

b.     In or about 2012, SCOTT TUCKER and TIMOTHY MUIR,
the defendants, and others known and unknown, participated in
the collection and attempted collection of unlawful usurious
loans from a customer in West Hempstead, New York ("Customer-
2").

c.     In or about 2012, SCOTT TUCKER and TIMOTHY MUIR,
the defendants, and others known and unknown, participated in
the collection and attempted collection of unlawful usurious
loans from a customer in Bristol, New Hampshire ("Customer-3").

24

d.   In or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Portland, Oregon ("Customer-4").

e.   In or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Middletown, Connecticut ("Customer-5").

(Title 18, United States Code, Section 1962(c).)

## COUNT THREE
### (Collection of Unlawful Debts - 500 FastCash)

The Grand Jury further charges:

40.   The allegations contained in paragraphs 1 through 34 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

41.   From at least in or about 2003, up to and including in or about August 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, in the Southern District of New York and elsewhere, being persons employed by and associated with the enterprise described in paragraphs 1 through 34 above, namely, the Tucker Payday Lending Organization, which enterprise was engaged in, and the activities of which affected interstate and foreign commerce,

25

willfully and knowingly did conduct and participate, directly and indirectly, in the conduct of such enterprise's affairs through the collection of unlawful debt, as described in paragraph 36.

42. The collection of unlawful debt, as that term is defined in Title 18, United States Code, Section 1961(6), that is, a debt (A) which is unenforceable under the laws of the State of New York and other States in whole and in part as to principal and interest because of the laws relating to usury, and (B) which was incurred in connection with the business of lending money and a thing of value at rates usurious under the laws of the State of New York and other States, where the usurious rates were at least twice the enforceable rates, through which SCOTT TUCKER and TIMOTHY MUIR, the defendants, did conduct and participate in the affairs of the enterprise, which was engaged in and the activities of which affected interstate commerce, consisted of collecting and attempting to collect an unlawful debt as follows:

a. From at least in or about 2010, up to and including in or about 2011, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in the Bronx, NY ("Customer-6").

26

b.     In or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in San Ramon, California ("Customer-7").

c.     In or about 2011, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Plattsburgh, New York ("Customer-8").

d.     From at least in or about 2012, up to and including in or about 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in High Point, North Carolina ("Customer-9").

e.     From at least in or about 2012, up to and including in or about 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in South Glens Falls, New York ("Customer-10").

(Title 18, United States Code, Section 1962(c).)

## COUNT FOUR
**(Collection of Unlawful Debts - One Click Cash)**

The Grand Jury further charges:

43.     The allegations contained in paragraphs 1 through 34

27

above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

44. From at least in or about 2005, up to and including in or about August 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, in the Southern District of New York and elsewhere, being persons employed by and associated with the enterprise described in paragraphs 1 through 34 above, namely, the Tucker Payday Lending Organization, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, willfully and knowingly did conduct and participate, directly and indirectly, in the conduct of such enterprise's affairs through the collection of unlawful debt, as described in paragraph 36.

45. The collection of unlawful debt, as that term is defined in Title 18, United States Code, Section 1961(6), that is, a debt (A) which is unenforceable under the laws of the State of New York and other States in whole and in part as to principal and interest because of the laws relating to usury, and (B) which was incurred in connection with the business of lending money and a thing of value at rates usurious under the laws of the State of New York and other States, where the usurious rates were at least twice the enforceable rates,

28

through which SCOTT TUCKER and TIMOTHY MUIR, the defendants, did conduct and participate in the affairs of the enterprise, which was engaged in and the activities of which affected interstate commerce, consisted of collecting and attempting to collect an unlawful debt as follows:

a.    From at least in or about 2009, up to and including in or about 2011, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Stony Point, New York ("Customer-11").

b.    From at least in or about 2012, up to and including in or about 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Tamaqua, Pennsylvania ("Customer-12").

c.    In or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Wilson, North Carolina ("Customer-13").

d.    From at least in or about 2009, up to and including in or about 2011, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans

29

from a customer in Sacramento, California ("Customer-14").

e. From at least in or about 2012, up to and including in or about 2013, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, participated in the collection and attempted collection of unlawful usurious loans from a customer in Elizabethtown, Kentucky ("Customer-15").

(Title 18, United States Code, Section 1962(c).)

## COUNT FIVE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

46. The allegations contained in paragraphs 1 through 34 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

47. From at least in or about 2004 up to and including in or about August 2013, in the Southern District of New York and elsewhere, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, to wit, TUCKER and MUIR conspired to make material misrepresentations concerning the true cost of payday loans offered by the Tucker Payday Lenders and the identity of the lender offering the loans in order to induce customers to obtain

30

the loans and to make payments on the loans exceeding the amounts allowed by law and the amounts which the customers were told they were required to pay.

48. It was a part and object of the conspiracy that SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT SIX
## (Wire Fraud)

The Grand Jury further charges:

49. The allegations contained in paragraphs 1 through 34 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

50. From at least in or about 2004 up to and including in or about August 2013, in the Southern District of New York and

31

elsewhere, SCOTT TUCKER and TIMOTHY MUIR, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, and by such conduct, did affect a financial institution, to wit, TUCKER and MUIR made material misrepresentations concerning the true cost of payday loans offered by the Tucker Payday Lenders and the identity of the lender offering the loans in order to induce customers to obtain the loans and to make payments on the loans exceeding the amounts allowed by law and the amounts which the customers were told they were required to pay.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SEVEN
### (Money Laundering Conspiracy)

The Grand Jury further charges:

51.  The allegations contained in paragraphs 1 through 34 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

32

52.  From at least in or about 2004 up to and including in or about August 2013, in the Southern District of New York and elsewhere, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, knowingly and intentionally did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

53.  It was a part and an object of the conspiracy that SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, in offenses involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, with the intent to promote the carrying on of such specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

54.  It was a further part and object of the conspiracy that SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, in offenses involving and affecting interstate and foreign commerce, knowing that the property

33

involved in certain financial transactions represented proceeds
of some form of unlawful activity, would and did conduct and
attempt to conduct such financial transactions, which in fact
involved the proceeds of specified unlawful activity, to wit,
wire fraud, in violation of Title 18, United States Code,
Section 1343, knowing that the transactions were designed in
whole and in part to conceal and disguise the nature, the
location, the source, the ownership, and the control of the
proceeds of specified unlawful activity, in violation of Title
18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## COUNT EIGHT
### (Promotion Money Laundering)

The Grand Jury further charges:

55.    The allegations contained in paragraphs 1 through 34
above are hereby repeated, realleged, and incorporated by
reference herein as though fully set forth herein.

56.    From at least in or about 2004 up to and including in
or about August 2013, in the Southern District of New York and
elsewhere, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and
others known and unknown, in offenses involving and affecting
interstate and foreign commerce, knowing that the property
involved in certain financial transactions represented proceeds

34

of some form of unlawful activity, did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, with the intent to promote the carrying on of such specified unlawful activity, to wit, TUCKER and MUIR used the proceeds of illegal payday loans to advertise and generate leads for, and to fund, new payday loans to additional customers by the Tucker Payday Lenders.

(Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.)

## COUNT NINE
### (Concealment Money Laundering)

The Grand Jury further charges:

57. The allegations contained in paragraphs 1 through 34 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

58. From at least in or about 2004 up to and including in or about August 2013, in the Southern District of New York and elsewhere, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, in offenses involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity, did conduct and attempt to

35

conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, TUCKER and MUIR engaged in financial transactions involving the proceeds of illegal payday loans, including various transactions involving nominally tribal entities, in order to conceal their ownership and/or control of the Tucker Payday Lenders, their receipt of proceeds of the illegal loans, and the illegal nature and source of their ill-gotten gains.

(Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)

## COUNTS TEN THROUGH FOURTEEN
### (False TILA Disclosures)

The Grand Jury further charges:

59. The allegations contained in paragraphs 1 through 34 above are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein.

60. From at least in or about 2004 through in or about 2012, SCOTT TUCKER and TIMOTHY MUIR, the defendants, and others known and unknown, in the Southern District of New York and

36

elsewhere, willfully and knowingly gave false and inaccurate
information and failed to provide information which they were
required to disclose under the Truth in Lending Act, 15 U.S.C.
§§ 1601 et seq. and regulations issued thereunder ("TILA"), and
used a chart and table authorized by the Bureau of Consumer
Financial Protection under 15 U.S.C. § 1606 in such a manner as
to consistently understate the annual percentage rate determined
under 15 U.S.C. § 1606(a)(1)(A), to wit, the defendants gave
customers false and inaccurate information in TILA disclosures
that materially understated the true cost of the loans extended
by each of the Tucker Payday Lenders set forth below:

| Count | Tucker Payday Lender |
|----------|----------------------|
| Ten | Ameriloan |
| Eleven | United Cash Loans |
| Twelve | US FastCash |
| Thirteen | 500 FastCash |
| Fourteen | One Click Cash |

(Title 15, United States Code, Section 1611 and
Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATIONS

61. As a result of committing the offenses alleged in
Counts One, Two, Three, and Four of this Indictment, SCOTT
TUCKER and TIMOTHY MUIR, the defendants, shall forfeit to the

37

United States, pursuant to Title 18, United States Code, Section 1963, a sum of United States currency equal to at least $2,000,000,000.00 in that such a sum represents (i) any interest acquired or maintained as a result of the offenses alleged in Counts One, Two, Three, and Four; (ii) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over of any enterprise which the defendant has established, operated, controlled, conducted, or participated in the conduct of, as part of the offenses charged in Counts One, Two, Three, or Four; or (iii) any property, constituting or derived from, any proceeds obtained, directly or indirectly, from the unlawful collections of debt charged in Counts One, Two, Three, and Four, including, but not limited to:

    i.       Any and all funds in account number 10840015031 in the name of BA Services LLC at Midwest Trust Company and any and all funds traceable thereto;

    ii.      Any and all funds in account number 10840015021 in the name of Tucker Scott FI at Midwest Trust Company and any and all funds traceable thereto;

    iii.    Any and all funds in account number 10840015041 in the name of Tucker Scott EQ at Midwest Trust Company and any and all funds traceable thereto;

    iv.      Any and all funds in account number 10840015556 in the name of Scott Tucker LT FI at Midwest Trust Company and any and all funds traceable thereto;

v.   Any and all funds in account number
97363826 in the name of Kim Cunningham
Tucker TTEE at Charles Schwab and any
and all funds traceable thereto;

vi.   Any and all funds in account number
10840017641 in the name of Kim Tucker
at Midwest Trust Company and any and
all funds traceable thereto;

vii.   Any and all funds in account number
2727864 in the name of BA Services LLC
- Operating Account at Welch Bank and
any and all funds traceable thereto;

viii.   Any and all funds in account number
10840016009 in the name of Black Creek
Capital LLC at Midwest Trust Company
and any and all funds traceable
thereto;

ix.   Any and all funds in account number
1218503 in the name of Level 5
Motorsports LLC at Capital City Bank
and any and all funds traceable
thereto;

x.   Any and all funds in account number
4026665 in the name of West Fund LLC at
Freedom Bank and any and all funds
traceable thereto;

xi.   Any and all funds in account number
18221313 in the name of Kim C. Tucker
at Charles Schwab and any and all funds
traceable thereto;

xii.   Any and all funds in account number
741003284 in the name of Stephanie R.
Tucker Muir at Commerce Bank and any
and all funds traceable thereto;

xiii.   Any and all funds in account number
35104126 in the name of Scott A. Tucker

39

at Charles Schwab and any and all funds
traceable thereto;

xiv. Any and all funds in account number
597554 in the name of Scott A. Tucker
POD Kim Tucker at First National Bank
of Louisburg and any and all funds
traceable thereto;

xv. Any and all funds in account number
590957615 in the name of Tim J. Muir at
Commerce Bank and any and all funds
traceable thereto;

xvi. Any and all funds in account number
4026053 in the name of West Fund LLC at
Freedom Bank and any and all funds
traceable thereto;

xvii. Any and all funds in account number
4026061 in the name of West Fund LLC at
Freedom Bank and any and all funds
traceable thereto;

xviii. Any and all funds in account number
13154972 in the name of Kim C. Tucker
at Charles Schwab and any and all funds
traceable thereto;

xix. Any and all funds in account number
2727974 in the name of BA Services LLC
– Payroll Account at Welch Bank and any
and all funds traceable thereto;

xx. Any and all funds in account number
735106896 in the name of Stephanie R.
Tucker or Tim J. Muir at Commerce Bank
and any and all funds traceable
thereto;

xxi. Any and all funds in account number
145591766784 in the name of AMG Capital
Management LLC at US Bank and any and
all funds traceable thereto;

40

xxii.     Any and all funds in account number
          1218423 in the name of Level 5
          Management LLC at Capital City Bank and
          any and all funds traceable thereto;

xxiii.    Any and all funds in account number
          1218458 in the name of Level 5 Apparel
          LLC at Capital City Bank and any and
          all funds traceable thereto;

xxiv.     Any and all funds in account number
          603325 in the name of ST Capital LLC at
          First National Bank of Louisburg and
          any and all funds traceable thereto;

xxv.      Any and all funds in account number
          1218431 in the name of Level 5 Eyewear
          LLC at Capital City Bank and any and
          all funds traceable thereto;

xxvi.     Any and all funds in account number
          1218466 in the name of Level 5
          Scientific LLC at Capital City Bank and
          any and all funds traceable thereto;

xxvii.    Any and all funds in account number
          1218474 in the name of Level 5 Capital
          Partners LLC at Capital City Bank and
          any and all funds traceable thereto;

xxviii.   All right, title and interest in real
          property located at 269 Park Avenue,
          Aspen CO 81611, with all improvements,
          appurtenances, and attachments thereon;

xxix.     All right, title and interest in real
          property located at 2405 W. 114th
          Street, Leawood, KS 66211, with all
          improvements, appurtenances, and
          attachments thereon;

xxx.      One Ferrari 599XX bearing VIN:
          ZFF69PXX000170883;

xxxi.     One 2011 Ferrari 599 GTO bearing VIN:

41

ZFF70RCA2B0175653;

xxxii.   One 2011 Porsche Cayenne bearing VIN:
         WP1AE2A26BLA91678;

xxxiii.  One 2011 Ferrari 458 Challenge bearing
         VIN: ZFF71NXX000179226;

xxxiv.   One 2011 Ferrari 458 Challenge bearing
         VIN: ZFF71NXX000177700;

xxxv.    One 2011 Porsche 911 GT2 RS bearing
         VIN: WP0AE2A92BS778077;

xxxvi.   One 2011 Porsche Panamera Turbo bearing
         VIN: WP0AC2A71BL090988;

xxxvii.  One 2011 Ferrari SA Aperta bearing VIN:
         ZFF72RHA7B0181404;

xxxviii. One 2005 Porsche Carrera GT bearing
         VIN: WP0CA29835L001261;

xxxix.   One 2014 Ferrari 458 bearing VIN:
         ZFF68NHA8E0196808;

xl.      One Model 60 Learjet bearing FAA
         Registration N551ST;

62.   As a result of committing wire fraud and conspiracy to
commit the same, as alleged in Counts Five and Six of this
Indictment, SCOTT TUCKER and TIMOTHY MUIR, the defendants, shall
forfeit to the United States, pursuant to Title 18, United
States Code, Section 981(a)(1)(C) and Title 28, United States
Code, Section 2461, any and all property, real or personal,
which constitutes or is derived from proceeds traceable to the
commission of Counts Five and Six of the Indictment, including,

42

but not limited to, a sum of United States currency equal to at least $2,000,000,000.00 representing the amount of proceeds traceable to the commission of said offenses and including, but not limited to, the following specific property:

  i. Any and all funds in account number 10840015031 in the name of BA Services LLC at Midwest Trust Company and any and all funds traceable thereto;

  ii. Any and all funds in account number 10840015021 in the name of Tucker Scott FI at Midwest Trust Company and any and all funds traceable thereto;

  iii. Any and all funds in account number 10840015041 in the name of Tucker Scott EQ at Midwest Trust Company and any and all funds traceable thereto;

  iv. Any and all funds in account number 10840015556 in the name of Scott Tucker LT FI at Midwest Trust Company and any and all funds traceable thereto;

  v. Any and all funds in account number 97363826 in the name of Kim Cunningham Tucker TTEE at Charles Schwab and any and all funds traceable thereto;

  vi. Any and all funds in account number 10840017641 in the name of Kim Tucker at Midwest Trust Company and any and all funds traceable thereto;

  vii. Any and all funds in account number 2727864 in the name of BA Services LLC – Operating Account at Welch Bank and any and all funds traceable thereto;

  viii. Any and all funds in account number 10840016009 in the name of Black Creek

Capital LLC at Midwest Trust Company and
any and all funds traceable thereto;

ix. Any and all funds in account number 1218503
in the name of Level 5 Motorsports LLC at
Capital City Bank and any and all funds
traceable thereto;

x. Any and all funds in account number 4026665
in the name of West Fund LLC at Freedom
Bank and any and all funds traceable
thereto;

xi. Any and all funds in account number
18221313 in the name of Kim C. Tucker at
Charles Schwab and any and all funds
traceable thereto;

xii. Any and all funds in account number
741003284 in the name of Stephanie R.
Tucker Muir at Commerce Bank and any and
all funds traceable thereto;

xiii. Any and all funds in account number
35104126 in the name of Scott A. Tucker at
Charles Schwab and any and all funds
traceable thereto;

xiv. Any and all funds in account number 597554
in the name of Scott A. Tucker POD Kim
Tucker at First National Bank of Louisburg
and any and all funds traceable thereto;

xv. Any and all funds in account number
590957615 in the name of Tim J. Muir at
Commerce Bank and any and all funds
traceable thereto;

xvi. Any and all funds in account number 4026053
in the name of West Fund LLC at Freedom
Bank and any and all funds traceable
thereto;

xvii. Any and all funds in account number 4026061
in the name of West Fund LLC at Freedom

44

Bank and any and all funds traceable
thereto;

xviii. Any and all funds in account number
13154972 in the name of Kim C. Tucker at
Charles Schwab and any and all funds
traceable thereto;

xix. Any and all funds in account number 2727974
in the name of BA Services LLC - Payroll
Account at Welch Bank and any and all funds
traceable thereto;

xx. Any and all funds in account number
735106896 in the name of Stephanie R.
Tucker or Tim J. Muir at Commerce Bank and
any and all funds traceable thereto;

xxi. Any and all funds in account number
145591766784 in the name of AMG Capital
Management LLC at US Bank and any and all
funds traceable thereto;

xxii. Any and all funds in account number 1218423
in the name of Level 5 Management LLC at
Capital City Bank and any and all funds
traceable thereto;

xxiii. Any and all funds in account number 1218458
in the name of Level 5 Apparel LLC at
Capital City Bank and any and all funds
traceable thereto;

xxiv. Any and all funds in account number 603325
in the name of ST Capital LLC at First
National Bank of Louisburg and any and all
funds traceable thereto;

xxv. Any and all funds in account number 1218431
in the name of Level 5 Eyewear LLC at
Capital City Bank and any and all funds
traceable thereto;

xxvi. Any and all funds in account number 1218466
in the name of Level 5 Scientific LLC at

45

Capital City Bank and any and all funds traceable thereto;

xxvii. Any and all funds in account number 1218474 in the name of Level 5 Capital Partners LLC at Capital City Bank and any and all funds traceable thereto;

xxviii. All right, title and interest in real property located at 269 Park Avenue, Aspen CO 81611, with all improvements, appurtenances, and attachments thereon;

xxix. All right, title and interest in real property located at 2405 W. 114th Street, Leawood, KS 66211, with all improvements, appurtenances, and attachments thereon;

xxx. One Ferrari 599XX bearing VIN: ZFF69PXX000170883;

xxxi. One 2011 Ferrari 599 GTO bearing VIN: ZFF70RCA2B0175653;

xxxii. One 2011 Porsche Cayenne bearing VIN: WP1AE2A26BLA91678;

xxxiii. One 2011 Ferrari 458 Challenge bearing VIN: ZFF71NXX000179226;

xxxiv. One 2011 Ferrari 458 Challenge bearing VIN: ZFF71NXX000177700;

xxxv. One 2011 Porsche 911 GT2 RS bearing VIN: WP0AE2A92BS778077;

xxxvi. One 2011 Porsche Panamera Turbo bearing VIN: WP0AC2A71BL090988;

xxxvii. One 2011 Ferrari SA Aperta bearing VIN: ZFF72RHA7B0181404;

xxxviii. One 2005 Porsche Carrera GT bearing VIN: WP0CA29835L001261;

46

    xxxix.  One 2014 Ferrari 458 bearing VIN:
            ZFF68NHA8E0196808;

      xl.  One Model 60 Learjet bearing FAA
           Registration N551ST;

63.  As a result of committing the money laundering offenses alleged in Counts Seven through Nine of this Indictment, SCOTT TUCKER and TIMOTHY MUIR, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real or personal, involved in said offenses, or any property traceable to such property, including, but not limited to, a sum of United States currency equal to at least $2,000,000,000.00 representing the amount of property involved in said offenses and including, but not limited to, the following specific property:

      i.  Any and all funds in account number
         10840015031 in the name of BA Services LLC
         at Midwest Trust Company and any and all
         funds traceable thereto;

     ii.  Any and all funds in account number
         10840015021 in the name of Tucker Scott FI
         at Midwest Trust Company and any and all
         funds traceable thereto;

    iii.  Any and all funds in account number
         10840015041 in the name of Tucker Scott EQ
         at Midwest Trust Company and any and all
         funds traceable thereto;

     iv.  Any and all funds in account number
         10840015556 in the name of Scott Tucker LT

47

FI at Midwest Trust Company and any and all
funds traceable thereto;

v. Any and all funds in account number
97363826 in the name of Kim Cunningham
Tucker TTEE at Charles Schwab and any and
all funds traceable thereto;

vi. Any and all funds in account number
10840017641 in the name of Kim Tucker at
Midwest Trust Company and any and all funds
traceable thereto;

vii. Any and all funds in account number 2727864
in the name of BA Services LLC - Operating
Account at Welch Bank and any and all funds
traceable thereto;

viii. Any and all funds in account number
10840016009 in the name of Black Creek
Capital LLC at Midwest Trust Company and
any and all funds traceable thereto;

ix. Any and all funds in account number 1218503
in the name of Level 5 Motorsports LLC at
Capital City Bank and any and all funds
traceable thereto;

x. Any and all funds in account number 4026665
in the name of West Fund LLC at Freedom
Bank and any and all funds traceable
thereto;

xi. Any and all funds in account number
18221313 in the name of Kim C. Tucker at
Charles Schwab and any and all funds
traceable thereto;

xii. Any and all funds in account number
741003284 in the name of Stephanie R.
Tucker Muir at Commerce Bank and any and
all funds traceable thereto;

xiii. Any and all funds in account number
35104126 in the name of Scott A. Tucker at

48

Charles Schwab and any and all funds
traceable thereto;

xiv. Any and all funds in account number 597554
in the name of Scott A. Tucker POD Kim
Tucker at First National Bank of Louisburg
and any and all funds traceable thereto;

xv. Any and all funds in account number
590957615 in the name of Tim J. Muir at
Commerce Bank and any and all funds
traceable thereto;

xvi. Any and all funds in account number 4026053
in the name of West Fund LLC at Freedom
Bank and any and all funds traceable
thereto;

xvii. Any and all funds in account number 4026061
in the name of West Fund LLC at Freedom
Bank and any and all funds traceable
thereto;

xviii. Any and all funds in account number
13154972 in the name of Kim C. Tucker at
Charles Schwab and any and all funds
traceable thereto;

xix. Any and all funds in account number 2727974
in the name of BA Services LLC – Payroll
Account at Welch Bank and any and all funds
traceable thereto;

xx. Any and all funds in account number
735106896 in the name of Stephanie R.
Tucker or Tim J. Muir at Commerce Bank and
any and all funds traceable thereto;

xxi. Any and all funds in account number
145591766784 in the name of AMG Capital
Management LLC at US Bank and any and all
funds traceable thereto;

xxii. Any and all funds in account number 1218423
in the name of Level 5 Management LLC at

49

Capital City Bank and any and all funds
traceable thereto;

xxiii. Any and all funds in account number 1218458
in the name of Level 5 Apparel LLC at
Capital City Bank and any and all funds
traceable thereto;

xxiv. Any and all funds in account number 603325
in the name of ST Capital LLC at First
National Bank of Louisburg and any and all
funds traceable thereto;

xxv. Any and all funds in account number 1218431
in the name of Level 5 Eyewear LLC at
Capital City Bank and any and all funds
traceable thereto;

xxvi. Any and all funds in account number 1218466
in the name of Level 5 Scientific LLC at
Capital City Bank and any and all funds
traceable thereto;

xxvii. Any and all funds in account number 1218474
in the name of Level 5 Capital Partners LLC
at Capital City Bank and any and all funds
traceable thereto;

xxviii. All right, title and interest in real
property located at 269 Park Avenue, Aspen
CO 81611, with all improvements,
appurtenances, and attachments thereon;

xxix. All right, title and interest in real
property located at 2405 W. 114th Street,
Leawood, KS 66211, with all improvements,
appurtenances, and attachments thereon;

xxx. One Ferrari 599XX bearing VIN:
ZFF69PXX000170883;

xxxi. One 2011 Ferrari 599 GTO bearing VIN:
ZFF70RCA2B0175653;

xxxii. One 2011 Porsche Cayenne bearing VIN:

50

WP1AE2A26BLA91678;

xxxiii. One 2011 Ferrari 458 Challenge bearing VIN: ZFF71NXX000179226;

xxxiv. One 2011 Ferrari 458 Challenge bearing VIN: ZFF71NXX000177700;

xxxv. One 2011 Porsche 911 GT2 RS bearing VIN: WP0AE2A92BS778077;

xxxvi. One 2011 Porsche Panamera Turbo bearing VIN: WP0AC2A71BL090988;

xxxvii. One 2011 Ferrari SA Aperta bearing VIN: ZFF72RHA7B0181404;

xxxviii. One 2005 Porsche Carrera GT bearing VIN: WP0CA29835L001261;

xxxix. One 2014 Ferrari 458 bearing VIN: ZFF68NHA8E0196808;

xl. One Model 60 Learjet bearing FAA Registration N551ST;

### Substitute Asset Provision

64. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i) cannot be located upon the exercise of due diligence;

(ii) has been transferred or sold to, or deposited with, a third person;

(iii) has been placed beyond the jurisdiction of the Court;

51

(iv) has been substantially diminished in value; or

(v) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Sections 981, 982 and 1963(m), Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461, to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981, 982 and 1963;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

52

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### SCOTT TUCKER and
### TIMOTHY MUIR

**Defendants.**

### SUPERSEDING
### INDICTMENT

S1 16 Cr. 91 (PKC)

(18 U.S.C. §§ 1343, 1349,
1956, 1962, 1963, and 2.)
(15 U.S.C. § 1611)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

11/30/16 FILED SUPERCODING INDICTMET
(CoT, SmT)

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States of America | |
| v. | |
| Conly Schulte, | |
| *Defendant*. | |

**Deferred Prosecution Agreement**

**19 Cr. ___ (DAB)**

To: Conly Schulte

On June 19, 2019, an information was filed in the Southern District of New York, in which you are charged with committing offenses against the United States, to wit, conspiracy to collect unlawful debts, in violation of 18 U.S.C. § 1961 *et seq.*, related to your involvement in the payday lending business of Scott Tucker ("Tucker") and various companies and entities controlled by or associated with Tucker, from in or about 2003 to in or about 2013. However, after a thorough investigation it has been determined that the interest of the United States and your own interest will best be served by deferring prosecution in this District. Prosecution will be deferred during the term of your good behavior and satisfactory compliance with the terms of this agreement (the "Agreement") for the period of one year from the signing of the Agreement. The terms and conditions constituting your good behavior and satisfactory compliance are as follows:

(1)     You hereby acknowledge, affirm and accept as accurate the Statement of Facts, attached hereto as Exhibit A, which is incorporated by reference herein.

(2)     You shall refrain from violation of any law (federal, state, and local). You shall immediately contact your U.S. Pretrial Services Officer if arrested or questioned by a law enforcement officer.

(3)     You shall associate only with law-abiding persons.

(4)     To the extent you are able, you shall work regularly at a lawful occupation and support your legal dependents. When out of work you shall notify your supervising U.S. Pretrial Services Officer at once. You shall consult him or her prior to job school changes.

(5)     You shall notify your supervising U.S. Pretrial Services Officer immediately of any change in your place of residence.

(6)     You shall follow your supervising U.S. Pretrial Services Officer's instructions and advice.

(7)     You shall report to or contact your supervising U.S. Pretrial Services Officer as directed.

(8)     You shall make payment of the Forfeiture Amount defined below to the United States no later than one year from the signing of the Agreement.

As a result of the conduct described in this Agreement and in the attached Statement of Facts, you agree, pursuant to Title 18, United States Code, Section 981(a)(1), to forfeit to the United States $424,753.00 (the "Forfeiture Amount"). You agree that the Forfeiture Amount represents a substitute *res* for net proceeds you personally obtained from Tucker in the offense described above from 2008 to 2013 in connection with the conduct described in the Statement of Facts. You further agree that the Forfeiture Amount is subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C). You further agree that this Agreement and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint") that will be filed against the Forfeiture Amount. By this agreement, you expressly waive any challenge to that Civil Forfeiture Complaint and consent to the forfeiture of the Forfeiture Amount to the United States. You agree that you will not file a claim with the Court or otherwise contest the civil forfeiture of the Forfeiture Amount and will not assist a third party in asserting any claim to the Forfeiture Amount. You also waive all rights to service or notice of the Civil Forfeiture Complaint, and agree to entry of a Judgment of Forfeiture against the Forfeiture Amount. You shall transfer the Forfeiture Amount to the United States no later than one year from the signing of the Agreement. Such payment shall be made by wire transfer to the United States Treasury, pursuant to wire instructions provided by the Office. You certify that the funds used to pay the Forfeiture Amount are not the subject of any lien, security agreement, or other encumbrance. Transferring encumbered funds or failing to pass clean title to these funds in any way will be considered a breach of this Agreement.

The United States Attorney may at any time revoke or modify any condition of this provisional release or change the period of such supervision. The United States Attorney may discharge you from supervision at any time. The United States Attorney may at any time proceed with the prosecution for this offense should the United States Attorney, in his or her sole discretion, deem such action advisable.

The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

It is understood that this Agreement is a public document and may be provided to any person by this Office and by you.

If upon completion of your supervision a written report from your supervising U.S. Pretrial Services Officer is received to the effect that you have complied with all the rules, regulations, conditions, and special conditions applicable to your deferred prosecution, no further prosecution will be instituted in this District for the above offense.

Dated:   New York, New York
         June 19, 2019

                                        GEOFFREY S. BERMAN
                                        United States Attorney for the
                                        Southern District of New York

                              By:       _____
                                        Sagar K. Ravi
                                        Hagan Scotten
                                        Assistant United States Attorneys
                                        Tel.:  (212) 637-2195 / 2410

The undersigned hereby consents to the foregoing and expressly waives any and all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.*, and any other pertinent provisions, and consents to the adjournment of all pending proceedings in this case.  The undersigned further waives the applicable statute of limitations with respect to any prosecution that is not time-barred on the date that this agreement is signed.  It is the intent of this provision to toll the applicable statute of limitations during the pendency of the deferred prosecution.

Dated:   New York, New York
         June 19, 2019

_____        _____
William C. Cagney, Esq.                 Conly Schulte
Attorney for Defendant                  Defendant

Pursuant to 18 U.S.C. §3161(h)(2), exclusion under the Speedy Trial Act of the period of time during which the prosecution of the defendant is deferred pursuant to this agreement is hereby approved.

Dated:   New York, New York
         June 19, 2019

                                        _____
                                        HONORABLE SARAH NETBURN
                                        United States Magistrate Judge

The undersigned hereby consents to the foregoing and will accept supervision of the above-named defendant on the conditions set forth herein.

Dated:     New York, New York
            June 19, 2019

_____
United States Pretrial Services Officer

## Exhibit A: Conly Schulte Statement of Facts

1.  From approximately in or about 2003 until at least in or about 2013, Conly Schulte ("Schulte") was the lead partner with the law firm Fredericks Peebles & Morgan LLP ("Fredericks Peebles") serving as counsel to The Miami Tribe of Oklahoma ("the Miami"), the Santee Sioux Tribe of Nebraska ("the Santee Sioux"), and the Modoc Tribe of Oklahoma ("the Modoc," and together with the Miami and the Santee Sioux, "the Tribes") in connection with business agreements concerning payday lending with Scott Tucker ("Tucker") and an entity controlled by Tucker (the "Tucker Payday Lending Business"). At the same time, from approximately in or about December 2003 until approximately in or about January 2008, Schulte also represented the entity controlled by Tucker in connection with those same business agreements. After approximately in or about January 2008, Schulte ceased formally representing the entity controlled by Tucker but continued to work with Tucker, and Tucker continued to pay Fredericks Peebles from bank accounts that were controlled by Tucker and held in the names of Tribal entities.

2.  Under the business agreements, Tucker and the entity controlled by Tucker, and not the Tribes, provided the capital to make loans, and the Tribes and their entities were not responsible for any losses and received monthly payments of 1% of gross collected revenues from the Tucker Payday Lending Business; none of the Tribes, nor any entity that they controlled, established or paid to acquire any part of the Tucker Payday Lending Business. Tucker and others based in Overland Park, Kansas, and not the Tribes, managed the loan operations and created the approval criteria. All essential steps necessary for the approval of loans were performed in Overland Park, under the direction of Tucker and individuals ultimately reporting to Tucker. Tucker, and others reporting to Tucker, controlled the collection of interest and principal on the loans and the profits earned from the lending activity.

3.  At all relevant times, Schulte was aware that the interest rates charged by Tucker on payday loans associated with the Tribes were illegal under the usury laws of several states in which payday loans were extended.

4.  In state court litigation concerning the Tucker Payday Lending Business, Schulte, and other attorneys at Fredericks Peebles acting under his direction, prepared and submitted multiple affidavits for representatives of each of the Tribes, who were also officers of Tribal entities that were involved in the Tucker Payday Lending Business. These affidavits were submitted to make it appear that the Tribes managed and controlled portions of the Tucker Payday Lending Business, so that the Tribes could assert that their sovereign immunity applied to those portions of the Tucker Payday Lending Business and the business could evade state usury laws. Tribal representatives have admitted that these affidavits were false, in part, because they overstated the involvement of the representatives of the Tribes, the Tribes, and the entities controlled by the Tribes in the operations of the Tucker Payday Lending Business; for example, several of the affidavits falsely stated, in substance and in part, that the Tribal representatives managed the day-to-day loan operations, that the loan

transactions occurred on Tribal lands, and that 100% of the profits were used exclusively for the benefit of the Tribes.